Cite as 2021 Ark. App. 336

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-19-415

|  |  |
|---|---|
|  | **Opinion Delivered** September 15, 2021 |
| ANN COGSWELL AND SARAH MCNEIL, AS SPECIAL ADMINISTRATORS FOR THE ESTATE OF MARGARET FAYE COGSWELL, DECEASED<br>APPELLANTS | APPEAL FROM THE POPE COUNTY CIRCUIT COURT [NO. 58CV-15-453] |
| V. | HONORABLE DENNIS CHARLES SUTTERFIELD, JUDGE |
| MARGARET LYNN COOPER, AS EXECUTRIX AND ADMINISTRATOR OF THE ESTATE OF MARY CLOAR, DECEASED<br>APPELLEE | AFFIRMED |

## MIKE MURPHY, Judge

Margaret Cogswell and Mary Cloar were sisters. They're both now deceased, and the last several years of their lives were spent in litigation over property located in Pope County, Arkansas, which they owned as tenants in common. The litigation continues on through their estates and respective representatives, but for the sake of simplicity, the parties will be referred to throughout by the sisters' names. In this appeal, Cogswell argues that the circuit court erred when it denied Cogswell's motion to rescind the settlement agreement between her and Mary Cloar and further erred when it granted Cloar's motion to enforce the settlement agreement. On appeal, Cogswell argues that the circuit court erred when it (1) found that the settlement agreement and deed were not forged and therefore valid; (2) found that the settlement agreement and deed were properly acknowledged; and (3) granted

Cloar's motion invoking Arkansas Rule of Evidence 615 ("the Rule"). We affirm.

The litigation began when Cloar petitioned the circuit court to partition the real property at issue. She and Cogswell owned it as tenants in common, with each sister owning an undivided one-half interest. She alleged they could not come to an agreement on how to divide the land and asked that the land be sold at auction with the proceeds to be equally divided.

The case was continued several times with the hopes that the parties could reach an agreement. Eventually, a settlement agreement was ostensibly signed by both parties, and the respective deeds were executed. That settlement provided that the sisters would exchange their interests in two parcels of land with each other and another parcel would be auctioned, with the proceeds divided.

Thereafter, Cogswell moved for recission of the settlement agreement. In that motion, Cogswell alleged that a forensic document examiner had examined Cloar's signatures and concluded they were forged on the settlement agreement and on the corresponding special warranty deed. (She also alleged that there were "mistakes" in the property descriptions included in the settlement agreement and the deeds but that, in the alternative to recension, she was willing to "re-consent" to "similar" terms.)

Cloar moved to enforce the settlement agreement. She asserted there was no forgery, and further, Cogswell was not abiding by the terms of the settlement agreement in that she was refusing to sign an auction contract. Cloar further asserted there were no errors in the property descriptions (prepared by Cogswell's former counsel) and that she would be happy to reexec ute the existing documents to Cogswell's satisfaction.

A trial was heard on the competing motions on September 11, 2018. Shortly before

this trial, Cloar's husband was substituted as a party on her behalf due to her declining health and his recent appointment as her guardian. At trial, Cogswell's counsel intimated that Cogswell no longer wished to abide by the terms of the settlement agreement and wanted instead to purchase the property, but the parties could not reach an agreed price prior to trial and went forward with the hearing.

Pertinent to this appeal, the court heard testimony from Brandon Moffitt, Cloar's counsel from the beginning of the litigation until he was made a witness by Cogswell's allegations of forgery and fraud. Moffitt testified that, on the day of the signing, he sat down with Mr. and Mrs. Cloar at his conference table at his office. They visited for a while socially and then discussed the litigation and the sale of the land. He explained how the title insurance would work. He testified that

> [a]fter it was all said and done, we talked about it. I asked both of them, do you understand it? And they did. So at that point, I asked Ms. Cloar, Katy, to sign. And she had told me that she had trouble holding a pen, and that she needed some help. And Ralph had confirmed that. So I was like, well, okay. And so she got up from across the table, walked around. Ralph was sitting down at the end of the table. She came over and kind of leaned over his back. She grabbed hold of his hand, the pen. I mean, it's just a lot of hands and an ink pen there, and the document was signed. . . . [S]he knew what was going on. . . . I visited with her a number of times. I've seen her a number of times after that date. We've always knew-she always knew what's going on. And she executed the documents at that point and in that manner. I notarized the signatures.
>
> . . . .
>
> Typically, I don't do that because I'm an attorney. But it was lunchtime and my secretary or paralegal was out. So for whatever reason, it worked out that way and I became a witness because I notarized it and that's the reason I'm no longer in the case. But that's—that's how the signatures were obtained in regard to the settlement agreement and the warranty deed or the special warranty.
>
> . . . .
>
> Based on my previous discussions with her and representation of her and the hour

on the day she signed it, I testify that she was competent a hundred percent. She knew what she was signing. She fully knew what was going on, and she executed the documents. She asked Mr. Cloar for assistance.

. . . .

Ms. Cloar got up when she signed these documents and went around behind Mr. Cloar—and then put her hand down on his hand. So what I—what I said is she came around. He was sitting down at the table. He had the pen. She came around, reached kind of like leaned down over his shoulder, put her hand down on his hand, the pen. There was just a—there was her hand was on top of his and the pen was up in between them. So that's basically what happened. And then they did the signature.

Ralph Cloar also testified. He said that "he assisted Katy in signing the settlement agreement and the deed." He went on to explain,

I have assisted her in signing Federal income tax returns; promissory notes at the bank in front of the bankers, which they notarize, I got audited by the IRS and I had to sign a settlement agreement for her—assist her in signing, and the IRS auditor accepted my assistance of her signing. This has been going on since the latter part of 2016. She has dementia. One of the early signs and how [we] recognized she had it was that she became unable to write a check. She became unable to drive a car, unable to sign her name or do any writing. She could carry on a conversation, she could problem solve and do all those things. [The first] neurologist we went to confirmed that in many cases of dementia, they lose the ability to perform tasks first. And that it will then get gradually increased where she even loses the ability to understand at some point. In 2015, when this partition action was commenced Katy was absolutely competent. She knew the lawsuit had been filed. Throughout the course of litigation, from 2015 until September of 2017, she participated in the litigation and the settlement negotiations fully. In September of 2017, when I assisted her in signing the settlement agreement she was competent absolutely. She knew what she was signing absolutely. Went over it paragraph by paragraph, Brandon did, with us. I mean, he played lawyer on this[.] She intended to sign it absolutely.

Grant Sperry, Cogswell's expert witness, also testified. Sperry is a forensic document examiner. He explained his process for evaluating signatures, and he stated that after review, he concluded that it was "highly probable" that Mary Cloar did not sign the documents in question. He stated that it was "probable" that Ralph Cloar wrote Mary's name. He further concluded that "an assisted or guided hand process was not employed in the execution of

the questioned signatures."

At the conclusion of the hearing, the court held the record open for posttrial briefing. The court then issued a ruling on January 22, 2019. In it, the court found that

> 2. Mary Cloar and Margaret Cogswell agreed to settle the case in September 2017.
>
> 3. The settlement was reduced to writing and signed by both parties.
>
> 4. Margaret Cogswell signed the Settlement Agreement on September 15, 2017, and her signature was verified by a notary in the State of California.
>
> 5. Mary Cloar signed the Settlement Agreement, with assistance, on September 27, 2017, and her signature was verified by a notary in the State of Arkansas.
>
> 6. The Settlement Agreement included a "deed swap" that required each party to sign a special warranty deed (referred to herein as the "Cloar Deed" and the "Cogswell Deed").
>
> 7. Mary Cloar signed the Cloar Deed, with assistance, on September 27, 2017, and her signature was verified by a notary in the State of Arkansas.
>
> 8. Margaret Cogswell signed the Cogswell Deed on November I. 2017, and her signature was verified by a notary in the State of Arkansas.
>
> 9. The Settlement Agreement required that the jointly-owned property that is the subject of this lawsuit and identified therein, Tracts I and 2, would be sold by auction and, under the terms of the Settlement Agreement, each party was to execute the Auction Agreement authorizing Wilson Auctioneers to sell the Subject Property. 10. Mary Cloar signed the Auction Agreement and therefore, has complied with all of the settlement terms.
>
> 11. Margaret Cogswell refused to sign the Auction Agreement and, therefore, has not complied with the terms of the Settlement Agreement.
>
> 12. There is no proof that Mary Cloar intended to deceive Margaret Cogswell, or that any actual deception occurred, when Mary Cloar signed the Settlement Agreement and related paperwork.

The court also made the following conclusions of law: both parties agreed to a settlement fully resolving all claims brought forth in the partition action; all elements of a

5

valid contract exist, thus the settlement agreement is enforceable; "[t]he signatures on the Cloar Deed and the Cogswell Deed . . . are valid"; Cloar intended to affix her signature to the settlement agreement and deed; and no forgery occurred. It granted Cloar's motion to enforce the settlement agreement and denied Cogswell's motion to rescind it. Cogswell now appeals. On appeal she argues that the circuit court erred in finding that no forgery existed (and thus, finding that the contract was valid); in finding that the settlement agreement and deed were properly acknowledged; and erred when it granted Cloar's motion invoking the Rule.

This court's standard of review following a bench trial is whether the circuit court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Steele v. Lyon*, 2015 Ark. App. 251, 460 S.W.3d 827. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

The law favors amicable settlement of controversies, and courts have a duty to encourage rather than discourage compromise as a method of resolving conflicting claims. *Terra Land Servs., Inc. v. McIntyre*, 2019 Ark. App. 118, at 12–13, 572 S.W.3d 424, 432. Nevertheless, a settlement is contractual in nature, and in order to be legally valid, it must possess the essential elements of a contract. *Id.* The essential elements of a contract are (1) competent parties; (2) subject matter; (3) legal consideration; (4) mutual agreement; and (5) mutual obligation. *Id.* There must be a meeting of the minds in order to have a valid contract, using objective indicators. *Id.* Whether there is a meeting of the minds is a question of fact. *Id.* Facts in dispute and determinations of credibility are solely within the province of the fact-finder. *Robinson v. Murphy*, 2020 Ark. App. 293, at 3, 601 S.W.3d 450, 452.

To begin, Cogswell does not argue, nor can she, that directing someone else to sign on one's behalf immediately invalidates an agreement. Nor does she contend that requiring assistance signing a written recitation of an agreement renders it invalid. Instead, she focuses solely on whether Cloar's signatures were forged. Forgery is defined as "the act of fraudulently making a false document or altering a real one to be used as if genuine." *Forgery*, *Black's Law Dictionary* (11th ed. 2019).

To support her claim of forgery, Cogswell points to the evidence of her witness, Mr. Sperry, who testified that the signatures did not appear to be Cloar's *or* an assisted version thereof. However, both the attorney, Brandon Moffit, and Ralph Cloar testified that Mary Cloar intended to sign the documents, understood what she was signing, and did sign them, albeit with some assistance. Cogswell would have this court become ultimate fact-finders and weigh the evidence presented below differently. We will not; this court does not substitute our judgment or second-guess the credibility determinations of the circuit court. We are not left with a definite and firm conviction that the circuit court made a mistake in finding that no forgery occurred.

Cogswell next argues that the circuit court erred when it construed the acknowledgments in the settlement agreement and deed as compliant with Arkansas Code Annotated section 21-14-107 (Supp. 2021), which provides instructions for signatures notarized by a notary public in Arkansas. Cogswell asserts that Arkansas law provides two different ways to acknowledge the signature of a person who is not physically able to sign her name, neither of which occurred in this matter. She contends that this also renders the acknowledgments "illegal and invalid." And, while Cogswell did make this argument in her posttrial brief, for which the court held the record open, she did not receive a ruling on

whether the subject documents were acknowledge in compliance with our notarization statutes or a ruling on what effect that has, if any, on the underlying validity of the documents executed.

It is an appellant's responsibility to obtain a ruling to preserve an issue for appeal. *Neal v. Sparks Reg'l Med. Ctr.*, 2012 Ark. 328, at 11, 422 S.W.3d 116, 122. The failure to obtain a ruling on an argument precludes appellate review because there is no order of a lower court on the issue for this court to review on appeal. *Id.* Because the circuit court did not specifically rule on the issue, we are precluded from addressing the merits of her argument on appeal.

Finally, Cogswell argues that the circuit court erred in excluding Ann Cogswell (Margaret Cogswell's daughter) and Grant Sperry (the forensics expert) from the courtroom upon invocation of the Rule.

The Rule requires the exclusion of witnesses from the courtroom to prevent them from adjusting their testimony on the basis of what they have heard prior witnesses say. Exclusion is mandatory upon request by either party, and only specific exceptions exist to allow witnesses to remain in the courtroom. *Hill v. State*, 337 Ark. 219, 225, 988 S.W.2d 487, 491 (1999). The standard of discretion given to the circuit court is no discretion—the rule is mandatory. *Id.* The purpose of the Rule is to expose inconsistencies in the testimony of different witnesses and to prevent the possibility of one witness's shaping his or her testimony to match that given by other witnesses at trial. *Id.* The exceptions to the rules are party members of the litigation who are people (i.e., not corporations), officers or employees of a party that is not a person, and a person whose presence is shown "to be essential to the presentation of his cause."

Cogswell argues that both Ann Cogswell and Grant Sperry should have been permitted to remain in the courtroom because their presence in the courtroom "was essential to the presentation of appellant's cause." Cogswell says that Ann could have "assisted counsel in his questions of witnesses and presentation of arguments" and that Sperry might need to change his conclusions if the other witnesses changed their testimony. This is not persuasive. At a minimum, Cogswell does not demonstrate any prejudice by this decision. On appeal, we determine whether the error of the circuit court concerning a Rule 615 challenge was harmless or prejudicial. *Clark v. State*, 323 Ark. 211, 216–17, 913 S.W.2d 297, 300 (1996). Cogswell does not give concrete examples of how counsel's approach would have been modified had Ann been present. Regarding the expert, in the event someone did change his or her testimony from what the expert expected, this could be addressed through examination. Prejudice is not presumed, and we do not reverse absent a showing of prejudice. *Id.* Cogswell has not demonstrated prejudice.

Affirmed.

GLADWIN and BROWN, JJ., agree.

*Niswanger Law Firm PLC*, by: *Stephen B. Niswanger*, for appellants.

*Leigh Law, PLLC*, by: *Victoria Leigh*; and *Walas Law Firm, PLLC*, by: *Breean Walas*, for appellee.

9